## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW HAMPSHIRE

| | |
|---|---|
| **SANDEEP JAIN,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| ) | |
| **v.** ) | **Civil No. 1:21-cv-** |
| ) | |
| **LINCOLN LIFE ASSURANCE COMPANY** ) | |
| **OF BOSTON,** ) | |
| ) | |
| ) | |
| **Defendant** ) | |
| _____ ) | |

## COMPLAINT

## I.    INTRODUCTION

1.      Plaintiff Sandeep Jain is insured under a Group Disability Policy, ("the Plan"). sponsored by ANSYS, Inc., his former employer.  On information and belief, the Plan is a welfare benefit plan under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 et seq.   Plaintiff received Short-Term Disability benefits under the Plan with as of February 22, 2017, and Long-Term Disability Benefits under the Plan until May 23, 2019. By letter dated May 9, 2019, Defendant terminated his benefits, claiming that he is no longer disabled under the Plan.  On the basis that he was not disabled, Defendant also determined that Mr. Jain was not eligible for a waiver of premiums due under a life insurance policy he had purchased from Defendant.  Having exhausted his administrative remedies under the Plan, Mr. Jain brings this action to overturn the denial and reinstate his benefits as of the date he was terminated, recoup premiums he paid for life insurance and for his attorney's fees and costs pursuant to 29 U.S.C. § 1132(g)(1).

## II.       JURISDICTION AND VENUE

2       This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and 29

U.S.C. §§ 1132(e)(1) and (f) of the Employee Retirement Income Security Act of 1974

("ERISA") over this claim for disability benefits under a policy governed by ERISA, 29 U.S.C. §

1001 et seq.

3.       Venue is proper in this Court under 29 U.S.C. § 1132 (e) (2).  Defendant conducts

ongoing business in New Hampshire, provides long term disability insurance for employers and

employees who reside in New Hampshire, employs New Hampshire residents, has extensive

contacts within New Hampshire, and accordingly, is found within New Hampshire.

## III.     PARTIES

4.       Plaintiff Sandeep Jain is a resident of the State of New Hampshire, and resides in

Lebanon, New Hampshire. He was formerly employed at ANSYS, Inc., the Plan sponsor, and

received long-term disability benefits under the Plan until May 23, 2019, when The Lincoln

terminated his benefits.   At all times relevant to this proceeding, he has been eligible to receive

long-term disability benefits under Group Policy number GD/GF3-830-510209-01.

5.       Defendant Lincoln Life Assurance Company of Boston is a corporation organized

and existing under the laws of the State of Massachusetts, with a principal place of business at

100 Liberty Way, Suite 100, Dover, NH 03820-4695 and is the insurer and claims administrator

for the Plan.  Pursuant to the Policy, Lincoln possesses the authority, in its sole discretion, to

construe the terms of this policy and to determine benefit eligibility thereunder.  On information

and belief, Defendant is the plan administrator for the Plan sponsored by ANSYS, Inc. to provide

its employees with income protection should they become disabled. On information and belief,

Defendant also provides group life insurance under a plan sponsored by ANSYS, Inc

## IV.   STATEMENT OF FACTS

6.      Plaintiff Sandeep Jain was employed as a Lead Software Developer by ANSYS, Inc. on the date of disability onset, February 22, 2017.  According to his job description ANSYS, Inc. provided to Defendant, Plaintiff's essential job functions were to "Research a large and complex software architecture and propose modifications to meet project requirements in functionality and performance", "Propose, design, implement, and maintain software components which meet project requirements", "Develop and maintain cross product communication protocols (RPC, Sockets, HPC, Cloud Computing, GPU, etc.)",  "Actively participate in project planning, design brainstorm sessions, and team meetings",  "Interact with project teams across business units to address corporate project requirements", "Conduct feature testing and resolve reported defects", "Work with technical writers to prepare documentation", "Work with software testers to define, implement, and maintain regression tests", "Work with internal support staff and customers to define project requirements."

7.      According to the job description, the position required "a minimum of a Master's or Ph.D. degree in applied math, computer science or computer engineering", "minimum of 5 years of programming experience in C++ development and familiarity with other high-level language such as Java, C#, or Fortran", "Experience in commercial software design and programming", "Solid skills in object oriented software design and programming", "Ability to work effectively and independently in a distributed team environment", "Excellent communication skills", "Solid knowledge of STL and Boost extensions to C++".

8.      In February, 2017, Plaintiff sustained a concussion and received a diagnosis of post-concussion syndrome. He applied for short-term disability benefits under the Plan.

Defendant initially denied his claim; Plaintiff appealed, and Defendant, by letter dated November 1, 2018, reversed its denial, and approved an onset date of February 22, 2017.

9.      Mr. Jain filed for long term disability benefits on or about November 11, 2017 with impairments of post-concussion syndrome, headaches with nausea, widespread body pain (head, neck, back, extremities), back and hip surgeries, history of fibromyalgia, and tendinopathy.

10.     Under the Plan, a participant who meets the definition of "Disabled" is entitled to long-term disability benefits paid out of the Plan assets.  A participant who meets the definition of "Disabled" under Defendant's life insurance policy is also eligible for a waiver of life insurance premiums.

11.     Under the Plan, "Disability" or "Disabled" means . . . that during the Elimination period and the next 24 months, the Covered Person, as a result of Injury or Sickness is unable to perform the Material and Substantial Duties of his Occupation and thereafter the Covered Person is unable to perform, with reasonable continuity, the Material and Substantive Duties of Any Occupation."

12.     The "Elimination Period" "with respect to Long Term Disability means a period of consecutive days of Disability or Partial Disability for which no benefit is payable. The Elimination Period is shown in the Schedule of Benefits and begins on the first day of Disability, and is "the greater of: a. the end of the Covered Person's Short Term Disability Benefits; or b. 180 days."

13.     In Mr. Jain's case, the "Elimination Period" was 180 days, dated from February 22, 2017, his first day of Disability.

14.     In support of his claim, Plaintiff authorized Defendant to obtain his medical records from his treating providers.

15.      On or around October 18, 2018, Defendant contracted with Seth Stoller, M.D., a board-certified neurologist for a peer review.

16.     Defendant provided Dr. Stoller with records that included Plaintiff's treating providers Lin Brown, M.D., Board certified in Rheumatology, Eric L. Bronstein, M.D., Board certified in Family Practice, Ross Zafonte, D.O., Board certified in Physical Medicine and Rehabilitation, Richard Comi, M.D., endocrinologist, Allie Start, M.D., neurologist. and Brooke Judd, M.D., a sleep specialist, an MRI of Plaintiff's cervical spine, dated September 25, 2018, blood tests, documents Plaintiff submitted from non-medical sources, a peer review, dated January 15, 2018 and August 29, 2018 by M. Farouche, a neurologist hired by Defendant, Plaintiff's application for Plan benefits, and other administrative documents filed in the case.

17.     Dr. Stoller stated, "For 2/22/17 continuously through 5/24/17, and from 5/25/17 forward, the medical documentation does support diagnoses causing functional impairment on a global level.  . . . During the time-frame under review, the claimant has severe symptoms from post-concussion syndrome.  . . . Physician notes clearly delineate a high subjective symptom score on HIT-6 of 62, which indicated the claimant's headaches have a severe impact on his functionality.  . . .  Dr. Zafonte also notes vestibular impairments on balance.  . . . The claimant has impairments in vestibular issues, with headaches, and severe mood issues.  . . . He has had multiple concussions which were clearly documented by both attending physicians. His post-concussion syndrome is severe and he has had slow improvement. Therefore, he is not able to return to work.  . . . For 2/22/17 continuously through 5/24/17 and from 5/25/17 forward, the medical documentation does support that the claimant's medical condition alone, or in

combination, would preclude the claimant from sustained occupational functioning on a full-time basis. . . . His attention, affect, and pain related symptoms are severe.  An MRI of the claimant's cervical spine demonstrates a significant disc bulge which may be contribution to his headaches and neck pain. These factors may contribute to some of his postconcussion syndrome."

18.     On November 1, 2018, Defendant approved Plaintiff's claim for long-term disability benefits, with a disability onset date of February 22, 2017.

19.     On or around March 5, 2019, Defendant contracted with Arousiak Varpetian Maraian, M.D., a neurologist to conduct a peer review.  On information and belief, Defendant did not send Dr. Maraian the same records it had sent to Dr. Stoller. Specifically, Dr. Stoller reviewed non-medical, as well as medical records, including the claimant's own statements, but Dr. Maraian only reviewed medical records.   On information and belief, there were only two medical records sent to Dr. Maraian that Dr. Stoller had not also reviewed.  These were two progress notes from December 3, 2018 and December 28, 2018 office visits to primary care provider Dr. Bronstein.  On December 3, 2018, Mr. Jain complained of neck pain and sensitivity to sound. Dr. Bronstein assessed his condition as "unchanged with chronic pain severe enough to impair his ability to sleep." Dr. Bronstein diagnosed chronic myofascial pain and post-concussion syndrome, and referred him to the spine center and for cognitive behavior therapy. On December 28, 2018, the claimant was seen for a dog bite, and prescribed Keflex.

20.     Dr. Maraian reviewed these records, and found that the "Cervical spine MRI on 9/24/18 showed multilevel degenerative disc disease with foraminal narrowing at C5-6," but no evidence of any abnormal physical findings related to back and neck pain, or evidence of impairment of function from neck and back pain.  He wrote "The claimant complained of headaches, but there is no documentation of uncontrolled pain requiring aggressive treatment or

hospitalization. Documents do not support impairment from headaches." Essentially disagreeing with Dr. Stoller's assessment in November, 2018, Dr. Maraian opined "There is no evidence in the records provided that the claimant was not able to work full time as of October 2018 onward."

21.     Defendant did not ask Dr. Maraian why his opinion differed from Dr. Stoller's, that the significant cervical disc degenerative changes  might contribute to Mr. Jain's headaches and post-concussion syndrome, or why he did not mention the symptom score on HIT-6 of 62.

22.     The Plan does not require "aggressive treatment or hospitalization" as a condition of eligibility to receive long-term disability benefits.

23.     On or around April 28, 2018, Defendant contracted with Dr. Nasreen Razack-Malik, board-certified in psychiatry to conduct a peer review.  Dr. Razack-Malik noted that the records include notes of depression and anxiety, but that Mr. Jain is not disabled from working from a psychiatric point of view.

24.     On or around April 12, 2019, Defendant sent Dr. Maraian's report to Dr. Bronstein.

25.      In a May 7, 2019 letter, Dr. Bronstein wrote, "I am currently caring for Sandeep Jain.  He continues to suffer from the same issues which caused his disability that was granted in November, 2018.  It is clear from the review done by Dr. Maraian that he did not have any of the recent documentation continuing to support my patient's disability from October 2018 forward. This includes the Lincoln Financial Group Restrictions Form done on 3/1/2019."

26.     In response to Dr. Maraian's claim that Mr. Jain has not had "aggressive treatment," (a claim that Dr. Bronstein described as "absurd"), Dr. Bronstein wrote, "Mr. Jain has been tried on over 30 well documented medication trials, received physical therapy,

physiatric therapy, pool therapy, is receiving cognitive behavioral therapy and received multiple specialty evaluations all of which document the suffering he continues to have.  Pain, particularly headache pain, is not something which can always be measured objectively.  It shows in the contracted life restrictions which now define my patient's day to day living and which have been attested to by his family.  . . . His chronic myofascial pain, low back pain, and cervical disc disease prevent him from lifting even 10# and he cannot bend (eg., [sic] bringing in a bag of groceries, pick up anything in the yard) more than a few times in an hour.  See Restrictions Form.  . . . In short, my patient suffers from ongoing, well documented problems of postconcussion syndrome, chronic unremitting migraine headaches, cervical disc disease with C5-6 neuroforaminal narrowing and radicular symptoms in the arms, and chronic myofascial pain syndrome all [sic] prevent him from gainful employment." Dr. Bronstein attached copies of consult notes dated January 28, 2019, February 1 2019, February 28, 2019, and April 16, 2019, a progress note dated April 17, 2019, an MRI report, dated March 19, 2019, medical history forms dated March 19,2019 and another copy of Defendant's Medical Restrictions Form that Dr, Bronstein had signed on March 1, 2019.

27.     In a May 9, 2019 letter, Defendant notified Mr. Jain that his long-term disability benefits would be terminated as of May 23, 2019 because it had determined that he was no longer disabled as defined under the Plan.

28.      In a May 29, 2019 letter, Defendant denied Mr. Jain's application for waiver of premiums due under ANSYS, Inc.'s Group Life Insurance Policy because he was not disabled under the Policy.

29.     On information and belief, the definition of Total Disability for the Waiver of Premium Benefit is as follows: "With respect to this provision, 'Total Disability' or 'Totally

8

Disabled' means the complete inability, as a result of Injury or Sickness, to perform the Material and Substantial Duties of Any Occupation. With respect to this provision, 'Material and Substantial Duties' means responsibilities that are normally required to perform Any Occupation, and cannot be reasonably eliminated or modified. With respect to this provision, 'Any Occupation' means any occupation that the Covered Employee is or becomes reasonably fitted by training, education, experience, age, physical and mental capacity."

30. As set forth in 29 U.S.C. § 1133 of ERISA, the Plan provides a mechanism for administrative appeals of benefit denials.

31. Pursuant to the Plan's Claims Procedures, Plaintiff, through his attorney, filed an administrative appeal of these decisions on October 3, 2019. This letter advised Defendant that he had been awarded Social Security Disability benefits, and requested that Defendant send a copy of the entire claim file and Plan documents to his attorney.

31. On February 2020, Plaintiff, through letter of his attorney, again asked for a copy of the clam file and the Plan documents.

32. Defendant did not send a copy of the claim file nor Plan Documents to Plaintiff's attorney until February 25, 2021.  Defendant still have not sent a copy of the Life Insurance Policy to Plaintiff or to his attorney.

33. In connection with this appeal, Defendant received voluminous updated medical information, including the results of clinical appointments, laboratory testing, medical opinions prepared by his numerous treating providers, and a functional capacity evaluation.

34. Janette L. Seville, M.D. treated Mr. Jain with cognitive behavior therapy to address pain management.  Her assessment was "distress related to coping with chronic pain and post concussive symptoms."

35.     Bruce M. Vrooman, M.D., an anesthesiologist and pain management specialist, saw Mr. Jain in consultation.  Dr. Vrooman's assessment was "chronic diffuse pain of unclear etiology, though likely a myofascial component with possible central sensitization along with inflammatory component of pain."  The plan was to titrate naltrexone, a pain medication.

36.     Mr. Jain followed up with rheumatologist Lin Brown M.D., who noted that. "the patient clearly struggles with his symptoms."

37.     On March 11, 2019, Plaintiff consulted with orthopedic surgeon Leonard Rudolf for back pain.  Dr. Rudolf's assessment was right sacroiliitis and sacroiliac joint dysfunction status post L4-L5 artificial disc and arthroscopic repair of right hip labral tear, with plan for pain management consultation for sacroiliac joint injection.

38.     On April 10, 2019, Mr. Jain consulted with neurosurgeon Hulda B. Magnadottir, M.D. for neck and upper extremity pain and paresthesias.  Her assessment was "significant osteophyte complexes both anteriorly and posteriorly at C5-C6 that would be best treated surgically with a discectomy and fusion but with greatest risk due to fibromyalgia and chronic pain syndrome."

39.     On April 19, 2019, Mr. Jain followed up with Stewart Tepper, M.D., a neurologist and headache specialist.

40.     On May 3, 2019, Mr. Jain had an initial evaluation by John M. Kravic, PT for low back pain radiating down his right leg and neck pain with frequent headaches.   Mr. Kravic assessed "insufficient exercise tolerance to successfully start intensive functional restoration program."

41.    Dr. Brown, treating rheumatologist, referred Mr. Jain for functional capacity evaluation.  The evaluator, Jeff Abrahamson, OTR, (an occupational therapist) determined that Mr. Jain had a below-sedentary occupational capacity.

42.    On or around November 25, 2019, Defendant contracted with Neil McPhee, M.D., board certified in physical medicine and rehabilitation to conduct a peer review.

43.    Dr. McPhee frequently conducts peer reviews of claims for long-term disability benefits.

44.    On information and belief, Defendant did not send Dr. McPhee the entire claim file to review.

45.    Dr. McPhee completed his peer review on or around November 25, 2019. Specifically, Dr. McPhee found that the following diagnoses caused permanent impairment: "A. Chronic low back pain status post L4/L5 disc replacement with criteria including history and x-rays showing presence of the artificial disc as well as multilevel moderate facet arthropathy. B. Chronic neck pain with variable radiculitis with criteria including history and MRI cervical spine showing multilevel moderate-to-severe neuroforaminal narrowing. C. Fibromyalgia/central sensitization with criteria including history and exam recording diffuse tenderness but no joint abnormalities or muscle atrophy and extensive laboratory testing and imaging to rule out other diagnoses.  D. Chronic right hip pain status post arthroscopy for labral tears and adductor muscle reattachment with past history being prior history and complaints. E. Post-concussion spectrum disorder with criteria including history of reportedly hitting his head on objects three times with chronic complaints but without loss of consciousness or evident pathology on MRI brain and no neuropsychometric testing to support cognitive limitations."  He found that the following

diagnosis was a temporary impairment: "Right sacroiliitis with criteria of positive provocative exam findings and s-ray showing some sclerosis around the sacroiliac joint."

46.     Although he accepted the diagnoses of specialists who had treated Mr. Jain, and reviewed the same diagnostic tests, Dr. McPhee concluded "the claimant may work full-time as none of the diagnoses would place him in significant medical risk from resuming his prior activities including sitting, standing, walking, and use of his upper extremities for general activities."  Dr. McPhee also opined that Mr. Jain "should" be able to do more than his current activity level.

47.     On information and belief, on or around November 25, 2019, Dr. McPhee sent Dr. Bronstein a two- page summary of his 28-page report, and requested his response.

48.     Dr. Bronstein responded to Dr. McPhee's letter in a January 5, 2020 letter to Defendant.  Dr. Bronstein wrote: "I have been Sandeep Jain's primary care provider for many years.  You concluded in your letter that Mr. Jain could work full time at an arbitrary level of lifting and physical activity, since 'none of his impairments would place him at medical risk from resuming his prior activities.'"  The issue that your evaluation failed to consider is whether Mr. Jain is actually able to resume any of the activities that he was able to do many years ago."

49.     Dr. Bronstein continued, "You have listed his diagnoses of impairment, but then listed a set of abilities (lifting, activities repetitions, etc.) which have absolutely NO basis in reality for this patient.  I therefore disagree with essentially every one of your assertions, because they have no basis in fact.

50.     Dr. Bronstein continued, "The facts are these:  Mr. Jain's disability is due to three major problems which interact and aggravate the others: 1) Post concussion syndrome, with chronic unremitting migraine headaches; 2) Chronic Pain Syndrome, which includes chronic

cervical disc disease and radiculopathy into his right arm, documented on MRI and clinically on

neurology notes and exams; and chronic low lumbar back pain, with an exhaustive list of

treatments including 3 surgeries and multiple other interventions documented in previous notes;

3) chronic myofascial pain."

51.     Dr. Bronstein noted that "Mr. Jain has seen a neurosurgeon, Dr. Hulda

Magnodottir, who considered recommending surgery for his cervical radiculopathy, but given his

past intolerance, side effects, poor outcomes, and complications from other procedures, she had

recommended that surgery be considered only as a last resort, due to the very real risk of

worsening his already precarious functional levels."

52.     On February 21, 2020, Dr. Brown, the treating rheumatologist, wrote that she has

treated Mr. Jain every six months for the past two and a half years, that he meets the American

College of Rheumatology criteria for fibromyalgia, with symptoms of multiple tender points,

nonrestorative sleep, chronic fatigue, temporomandibular joint dysfunction, numbness and

tingling, with movement/overuse and static position contributing factors to pain, with a poor

prognosis.

53.     On March 9, 2020. Dr. Tepper, the neurologist treating Mr. Jain for headaches,

reported that he diagnosed Mr. Jain with "chronic migraine, intractable with symptoms of

malaise, visual disturbance, and mental confusion/inability to concentrate, occurring 15-20

days/month, brought on, by noise, among other stimuli, exacerbated by noise, bright lights, and

moving around, and relieved by lying in a dark room.  He cited cervical disc disease as a

reasonable explanation for Mr. Jain's headaches.  He believed that would likely need to take

unscheduled breaks during the work day, about 10 days a month, when he would need to lie

down in a quiet room. He opined that Mr. Jain would not be able to sustain even "low stress" work.

54.     Dr.  McPhee amended his report on January 25, 2020, January 28, 2020, and April 7, 2020, to find fault with these and other updated medical records Defendant received after he wrote his original report.  Dr. McPhee did not change the conclusions in his original report.  Dr. McPhee did not mention Dr. Tepper's diagnosis of chronic migraines.

55.     In a letter dated May 9, 2020, Defendant upheld its decision to terminate long term disability benefits and waiver of life insurance premiums.

56.     In its decision, Defendant quoted at length from Dr. Maraian's report, but did not discuss Dr. Bronstein's objection to the report at all, other than to quote Dr. Maraian's rebuttal, again extensively.

57.     Similarly, Defendant acknowledged receipt of, but did not discuss, reports prepared by Dr. Brown, Dr. Tepper, a second response from Dr. Bronstein after he received Dr. McPhee's entire report from Mr. Jain's counsel, or the functional capacity evaluation, except to quote extensively from Dr. McPhee's purported rebuttals of these records.

58.     Dr. McPhee is not board certified in neurology, like Dr. Tepper, nor is he board-certified in rheumatology, like Dr. Brown.  However, Defendant credited his rebuttal of these treating specialists over the opinions of the specialists themselves, not even discussing the reason that the opinion of a nonspecialist who conducted a records review should be given greater weight than the opinion of a treating specialist.

59.     Defendant ignored Dr. Tepper's diagnosis of chronic migraine, and his conclusion regarding the incapacitating effect of this condition on Mr. Jain's functioning.

60.     Defendant quotes from Dr. McPhee's report about a telephone conversation the latter had with Dr. Brown. Although Dr. McPhee alleges, without any evidence, that Dr. Brown concurred with certain of his conclusions, Defendant credits this allegation. Defendant also selectively edited Dr. McPhee's report of that conversation, omitting such phrases as Dr. Brown's statement that Mr. Jain "is remarkably compromised."

61.     Defendant also quotes from Dr. McPhee's report that the conclusions in the functional capacity evaluation "were not valid," but ignores the evidence of reliability Mr. Abrahamson cited for his conclusions. Specifically, Mr. Abrahamson wrote: "Overall test findings, in combination with clinical observations, suggest the presence of minor inconsistency to the reliability and accuracy of Mr. Jain's reports of pain and disability. Again [sic] the chronicity of Mr. Jain's pain would be expected to have a cognitive behavioral aspect to it, which is well documented in his record. He is receiving cognitive behavioral therapy for this. Mr. Jain demonstrated significant weakness in his upper body, especially right side, due to C5-6 radiculopathy. He demonstrates a shuffling ataxic type gait, again worse on right side then left, consistent with hip sciatica. Difficulty with repeated forward reaching and prolonged neck positions. . . . his right hand grip scores were indicative of a high level of effort; left hand grip scores also are indicative of a high level of effort. Curve analysis suggestive of maximum voluntary effort on the right and maximum voluntary effort on the left." Mr. Abrahamson noted "poor tolerance to seated work requiring forward lean, poor tolerance to repetitive forward reaching, poor tolerance to prolonged sitting, poor tolerance to prolonged static neck positioning."

62.     In sum, on appeal, Defendant only cited evidence that supported its initial conclusion that Mr. Jain is not disabled, and ignored evidence that supports his claim.

63.     The definition of Disability under the Plan does not mention the ability to engage in activities at a level that would "not place the claimant in significant medical risk," the criterion Dr. McPhee used to conclude that Mr. Jain was capable to work at the light exertional level.

64.     Defendant's alleged "vocational review" was limited to the *physical* as opposed to the mental demands of Mr. Jain's occupation as a lead software developer.  Defendant did not explain why it did not consider the essential job functions, but limited itself to the physical demands of the job in determining that he could return to his former occupation.

65.     The definition of Disability under the Plan is not limited to the inability to engage in the physical as opposed to the mental demands of the job,

67.     Defendant did not take into account, nor discuss, the decision of the Social Security Administration that Mr. Jain had been awarded benefits, even though Mr. Jain raised this in his October 3, 2019 appeal letter.  Specifically, through counsel, Mr. Jain pointed out:

> The determination of disability by the Social Security Administration is *more* stringent than the definition of disability under your Plan.  Under Social Security Disability regulations, an individual is not considered disabled if he/she earns $1220 gross a month; whereas, your Plan only terminates benefits is the recipient is able to work in "Any Occupation", meaning any occupation that Mr. Jain is or becomes reasonably fitted.  In Mr. Jain's case, this would entail a monthly income substantially greater than $1220.  Secondly, under Social Security regulations, if a 50-year-old man with a high level of experience and education, such as Mr. Jain, is not found eligible on the basis of medical reasons alone, he would only be found eligible if 1) he were unable to perform work he has performed in the last 15 years, and 2) vocational evidence established that there were no other jobs that exist in significant numbers in the national or regional economy that he could perform.  As described above, your evaluation of the medical evidence was arbitrary and capricious because it did not take into account the opinions of the treating providers, and was based solely on a review of records by a psychiatrist and neurologist, and not by any specialists (rheumatologist and orthopedist) who treat Mr. Jain, and you have presented no vocational evidence that there are other jobs that Mr. Jain can perform, A condition of eligibility for long-term disability benefits under the ANSYS plan is that the recipient apply for Social Security Disability benefits; accordingly, it is disingenuous to deny Plan benefits after Mr. Jain meets the Social Security Administration's more stringent requirements for eligibility, and the Plan is reimbursed under the coordination of benefits provision.

68.     Defendant did not discuss the reason it rejected the opinion of Dr. Seth Stoller, its own peer reviewer who had found Mr. Jain to be disabled, nor discuss Dr. Stoller's opinion at all.

69.     Defendant ignored the non-exertional limitations that the medical evidence in the record validates as a result of Mr. Jain's impairments.

70.     Defendant ignored non-medical evidence, such as notarized statements from Mr. Jain's brother and personal assistant that corroborated Plaintiff's statements.

71.     Defendant did not identify any evidence to show that Mr. Jain's condition had improved.

72.     Defendant did not explain why the evidence supported a finding that Mr. Jain could perform his former occupation as of May 24, 2019, but could not perform it between May 24, 2017 through May 23, 2019.

73.     Defendant did not consider the combined effects of Mr. Jain's multiple impairments, or that the totality of his impairments may have a greater functional impact than each impairment considered individually.

74.     Defendant did not consult an expert in vocational rehabilitation or job analysis before it determined that Plaintiff was capable of performing the normal responsibilities of his position in an acceptable manner.

75.     Defendant did not explain why it rejected the opinion of a physician it hired who determined that Mr. Jain could not work, but accepted the opinion of other physicians it hired who determined that he could work.

76.     On information and belief, Defendant relied on the opinions of medical professionals who were financially biased by their relationship with it, and as such unable to offer an unbiased opinion.

77.     Defendant relied on the opinions of non-examining medical professionals who never examined Plaintiff, while disputing the opinions of Plaintiff's treating medical professionals;

78.     On information and belief, Defendant both funds the Plan and decides whether participants will receive benefits under the Plan.

80.     Accordingly, Defendant has a conflict of interest, which must be considered when determining whether its denial of Plaintiff's benefits was proper.

81.     Defendant's decision to deny long-term disability benefits was arbitrary, capricious, unreasonable, irrational, an abuse of discretion, contrary to the terms of the Plan, and a violation of its fiduciary duty to Plaintiff.

## V.     CLAIMS

### As and For a First Claim
### Claim for benefits pursuant to 29 U.S.C. § 1132(a)(1)(B)

82.     Plaintiff restates and herein incorporates Paragraphs 1-81.

83.     29 U.S.C. § 1132(a)(1)(B) provides a plan participant with the right to bring a civil action "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan.

84.     The Plan is an ERISA welfare benefit policy.

85.     Under the Plan, a participant who meets the definition of "Disabled" is entitled to Long-Term Disability benefits paid out of Plan assets.

86.     Plaintiff was covered at all relevant times under the Plan.

87.     Plaintiff' remains "Disabled" at all relevant times under the Plan.

88.     The Lincoln owes a fiduciary responsibility to Plan participants to act in the best interests of each Plan participant.

89.     The Lincoln's decision to terminate Long-Term Disability Benefits was an exercise of bad faith, a breach of its fiduciary responsibility, arbitrary, capricious, unreasonable, irrational, an abuse of discretion, contrary to the terms of the Plan, contrary to the evidence and contrary to law.

**As and For a Second Claim**
**Violation of 29 C.F.R. § 2560.503-1 (j) (6) (i) (B)**

90.     Plaintiff restates and herein incorporates Paragraphs 1-81.

91.     ERISA's implementing regulations at 29 C.F.R. § 2560.503-1 (j) (6) (i) (B) provide that an adverse decision regarding disability benefits must include:

(i) . . .  an explanation of the basis for disagreeing with or not following:

* * *

(B) The views of medical or vocational experts whose advice was obtained on behalf of the plan in connection with a claimant's adverse benefit determination, without regard to whether the advice was relied upon in making the benefit determination;

92.     Defendant contracted with Seth Stoller, M.D. to conduct a peer review of Plaintiff's eligibility for disability benefits.

93.     Dr. Stoller concluded that Plaintiff was unable to work due to his disabling conditions.

94.     Defendant did not explain the basis for disagreeing with Dr. Stoller's opinion in its letter terminating Plaintiff's long term disability benefits and denying him a waiver of premium of his life insurance policy.

**As and For a Third Claim**
**Violation of 29 C.F.R. §2560.503-1 (j) (6) (i) (C)**

95.      Plaintiff restates and herein incorporates Paragraphs 1-82.

96.      ERISA's implementing regulations at 29 C.F.R. § 2560.503-1 (j) (6) (i) (C)

provide that an adverse decision regarding disability benefits must include:

(i) . . . an explanation of the basis for disagreeing with or not following:

**(C)**      A disability determination regarding the claimant presented by the
claimant to the plan made by the Social Security Administration.

97.      In his October 3, 2019 appeal letter, Plaintiff, through counsel, notified Defendant

that he had been awarded Social Security Disability Benefits.  Defendant ignored this in its

adverse determination.

**As and For a Fourth Claim**
**Claim for Waiver of Life Insurance Premium pursuant to 29 U.S.C. § 1132(a)(1)(B)**

98.      Plaintiff restates and herein incorporates Paragraphs 1-81.

99.      29 U.S.C. § 1132(a)(1)(B) provides a plan participant with the right to bring a

civil action "to recover benefits due to him under the terms of his plan, to enforce his rights

under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan.

99.      The Life Insurance Policy is an ERISA welfare benefit policy.

100.      Under the Policy, a participant who meets the definition of "Disabled" is entitled

to waiver of insurance premiums due under the Policy.

101.      Plaintiff was covered at all relevant times under the Policy.

102.      Plaintiff' remains "Disabled" at all relevant times under the Policy.

103.      The Lincoln owes a fiduciary responsibility to Policy participants to act in the

best interests of each participant.

104.     The Lincoln's decision to deny a waiver of premiums due under the policy was an exercise of bad faith, a breach of its fiduciary responsibility, arbitrary, capricious, unreasonable, irrational, an abuse of discretion, contrary to the terms of the Plan, contrary to the evidence and contrary to law.

**WHEREFORE,** Plaintiff respectfully requests the following relief against Defendant:

A.     Pursuant to 29 U.S.C. § 1132(a)(1)(B), a declaration that Plaintiff is entitled to ongoing benefits under the Plan so as long as Plaintiff remains disabled under the terms of the Plan;

B.     Pursuant to 29 U.S.C. § 1132(a)(1)(B), damages in the amount equal to the disability income benefits to which Plaintiff is entitled through the date of judgment;

C.     Pursuant to 29 U.S.C. § 1132(a)(1)(B), damages in the amount equal to life insurance premiums which should have been waived through the date of judgment;

D.     Prejudgment and postjudgment interest, calculated from each payment's original due date through the date of actual payment;

E.     Any Plan benefits beyond disability benefits that Plaintiff is entitled to while receiving disability benefits;

F.     A declaration that Plaintiff is entitled to waiver of premium of the Group Life Insurance Policy;

G.     Pursuant to 29 U.S.C. § 1132(g)(1), reimbursement for reasonable costs and attorneys' fees incurred in this action;

H.     For such other and further relief as is just and proper.

RESPECTFULLY SUBMITTED THIS  29th day of March, 2021,

SANDEEP JAIN

By: /s/ Sheila O'Leary Zakre (#9101)
Zakre Law Office
4 Park Street, Suite 206
Concord, NH 03301
603-224-4400
sheila@zlawnh.com
Attorney for Sandeep Jain